UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-60976-CIV-ROSENBAUM-HUNT

SAMARI ROLLE,

    Plaintiff,

vs.

BRANCH BANKING AND TRUST COMPANY, as successor to BANKATLANTIC,

    Defendant.

_____/

## DEFENDANT, BRANCH BANKING AND TRUST COMPANY'S, STATEMENT OF MATERIAL FACTS

    Defendant, Branch Banking and Trust Company, as successor to BankAtlantic ("BankAtlantic"), by and through its undersigned counsel, and pursuant to Southern District of Florida Local Rule 56.1, hereby files and serves this Statement of Material Facts in support of its Motion for Summary Judgment:

    1.    Plaintiff, Samari T. Rolle ("Plaintiff"), is a former football player in the National Football League, and is former client of Pro Sports Financial, Inc. ("Pro Sports"). [Rolle Dep., at 8:15–8:24];[1] [Corr. Am. Compl., at ¶¶ 7, 9]. Plaintiff first hired Jeffrey Rubin ("Rubin") and Pro Sports, in September 2001, which is shortly after he signed a contract with the Tennessee Titans. [Rolle Dep., at 34:21–34:25].

    2.    Pro Sports was a financial management company exclusively dedicated to servicing the financial needs of professional athletes. [Corr. Am. Compl., at ¶ 10]. Plaintiff began his financial relationship with Pro Sports as early as March 20, 2001, when Plaintiff executed a letter to BankAtlantic detailing the full extent of Pro Sports' control over his financial accounts and affairs, stating:

    TO:        Bank Atlantic
    FROM:    Samari Rolle
    DATE:     March 20, 2001

---

[1] Plaintiff's deposition is attached hereto as Exhibit "A."

> I, Samari Rolle, am authorizing Pro Sports Financial, Inc., to initiate transactions in my Bank Atlantic account on my behalf. Any verbal or written request from Pro Sports Financial or stall of Pro Sports Financial is to be processed immediately. This includes issuing checks, paying bills, transferring funds, wire transfers and any other necessary transaction.
>
> Please contact Jeffrey Rubin with any questions.

[Stmt. of Material Facts, Exh. "B"]; [Rolle Dep., at 191:10–192:7].

3.      Plaintiff hired Pro Sports for the purpose of providing "concierge" financial services, which included among other things, paying Plaintiff's monthly bills, making travel arrangements, arranging for home repairs to the Plaintiff's residence, and preparing the Plaintiff's tax returns. [Rolle Dep., 29:3–29:5; 45:19–47:7].

4.      The arrangement consisted of Pro Sports having authorized access to Plaintiff's bank account for the purpose of providing such concierge services to Plaintiff. [Rolle Dep., at 43:24–44:24]. With respect to Pro Sports' access, Plaintiff testified:

> **Q:     Ok. So Pro Sports was paying for that electrician?**
> **A:     Yes.**
> **Q:     Out of your BankAtlantic checking account?**
> **A:     The bill pay account.**
> **Q:     Bill pay account?**
> **A:     Yes.**
> **Q:     Is that what you or Jeff Rubin called your bank account?**
> **A:     Yes.**
> **Q:     And you wanted them to do this service for you, correct?**
> **A:     Yes.**
> **. . .**
> **Q:     Okay. Why did you want to get out of that – well, Pro Sports controlled that account?**
> **A:     Yes.**
> **Q:     Your previous BankAtlantic account?**
> **A:     Correct.**
> **Q:     And you knew they were controlling your BankAtlantic account?**
> **A:     Yes.**
> **Q:     They were paying all of your bills out of it?**
> **A:     Yes.**
> **Q:     And they were telling you what the balance was?**
> **A:     Yes.**
> **Q:     That's where monies were being invested out of, and they told you what the balance was?**
> **A:     Yes.**

[Rolle Dep., at 45:19–46:6; 103:10–104:2]

5. Upon hiring Pro Sports in September 2001, Plaintiff authorized the opening of a BankAtlantic account in his name. [Rolle Dep., 34:21–35:6]. Specifically, Plaintiff stated "I knew I was opening an account." [Rolle Dep., 36:9]. The account opened in September 2001 by Plaintiff was a deposit account ending in 4614 (the "4614 Account"). [Aff.. in Support, at ¶ 10].[2]

6. With Plaintiff's knowledge, Pro Sports also received Plaintiff's account statements for his 4614 Account, as well as all of his monthly bills for all his utilities payments and other expenses. [Rolle Dep., at 52:24–53:8]; [Stmt. of Material Facts, Exh. "D," at p. 3]. In turn, Pro Sports provided the Plaintiff with a periodic statement of his account balances and summary of his financial affairs. [Rolle Dep., at 53:5–54:5].

7. On September 11, 2011, the same day Plaintiff opened his 4614 Account, Plaintiff also entrusted Pro Sports with a one million dollar signing-bonus check he received from the Tennessee Titans so that Pro Sports could arrange for the payment of his moving expenses. [Rolle Dep., at 36:21–37:12].

8. From 2001 to 2004, Pro Sports used Plaintiff's 4614 Account, with his consent, to pay his monthly bills and to arrange for contractors to make home repairs in his Nashville residence. [Rolle Dep., at 43:8–44:16]. If Plaintiff needed any home repair services or travel arrangements, Plaintiff would simply contact Pro Sports or its employees, who would then arrange for an electrician or airplane tickets to arrive and pay the bill associated with those services. [Rolle Dep., at 44:17–46:25].

9. Moreover, Plaintiff directed his payroll checks with the Tennessee Titans to be deposited into his BankAtlantic account for the purpose of providing funds to Pro Sports to pay Plaintiff's regular expenses. [Rolle Dep., at 89:15–90:4; 92:3–93:7].

10. All account statements for Plaintiff's 4614 Account were delivered by BankAtlantic to Pro Sports at its headquarters beginning on October 5, 2001. [Rolle Dep., at 52:24–53:8; 74:25–75:16]. Notably, Plaintiff knew that Pro Sports was receiving these BankAtlantic account statements and periodically asked Rubin to review his statements. [Rolle Dep., at 52:24–53:8; 74:25–75:16].

11. Plaintiff also maintained personal access to his 4614 Account. For example, on February 16, 2006, Plaintiff personally withdrew $6,000.00 in cash from the 4614 account. [Aff.

---

[2] BankAtlantic's Affidavit in Support of Summary Judgment is attached hereto as Exhibit "C."

in Support, at ¶ 11]; [Rolle Dep., at 213:7–213:23] (authenticating signature on account withdrawals). Similarly, Plaintiff withdrew $12,000.00 on May 5, 2006, $3,500.00 on May 6, 2006, $5,000.00 on July 19, 2006, and $2,500.00 on October 2, 2006. [Aff. in Support, at ¶ 11]; [Rolle Dep., at 213:7–213:23]. Plaintiff also endorsed and deposited checks received from the Baltimore Ravens into his 4614 Account, including a check for $95,993.84 issued September 13, 2006. [Aff. in Support, at ¶ 11]; [Rolle Dep., at 213:7–213:23].

12. Plaintiff further testified that in June or July of 2006, he personally entered a BankAtlantic branch location and obtain a debit card for his account so that he could have personal access to the funds in his account and make purchases with the funds. [Rolle Dep., at 75:17–76:17; 78:3–78:18]. Plaintiff also made balance inquiring of his BankAtlantic account using his debit/ATM card. [Aff. in Support, at ¶ 16, 22].

13. On October 15, 2006, a burglary incident occurred at the Pro Sports headquarters on 6600 N. Andrews Ave, Suite 130, Fort Lauderdale, FL 33309. [Stmt. of Material Facts, Exh. "E," at p. 1, 2, 7]. As part of that incident, Pro Sports' computer servers were taken from their offices. [Stmt. of Material Facts, Exh. "E," at p. 5]. These computer servers contained the confidential financial records and information of Plaintiff and numerous other professional athletes that were Pro Sports' clients at the time. [Stmt. of Material Facts, Exh. "E," at p. 7]. Peggy Lee, a Pro Sports employee, represented to the police officer investigating the October 15, 2006, burglary that she was concerned that the security of the financial information of Pro Sports' clients had been compromised. [Stmt. of Material Facts, Exh. "E," at p. 7].

14. The following day, on October 16, 2006, an additional account was opened in Plaintiff's name ending in 7425 (the "7425 Account"). [Aff. in Support, at ¶ 12]. That 7425 Account listed Pro Sports employee Erick Carter as Plaintiff's power of attorney. [Aff. in Support, at ¶ 12].

15. Plaintiff's financial activity was then transferred from his 4614 Account to his 7425 Account. [Aff. in Support, at ¶ 13]. Specifically, Plaintiff's financial activity, including direct deposits from the Baltimore Ravens and preauthorized debits for Adelphia, Allstate, American Express, American Home Mortgage, Bellsouth/AT&T, Baltimore Gas, Comcast, DirecTV, Florida Power & Light, MBNA America, Palm Beach County Water, U.S. Bank, and Verizon were all transferred from his 4614 Account to his 7425 Account. [Aff. in Support, at ¶ 13].

16. Just as with his 4614 Account, Pro Sports began receiving Plaintiff's monthly account statements from BankAtlantic for his 7425 Account. [Aff. in Support, at ¶ 15]; [Rolle Dep., at 74:25–75:16]. In 2006, Plaintiff was still aware that Pro Sports was receiving his statements. [Rolle Dep., at 50:22–51:5]. At no time did Plaintiff make any objection to this arrangement with BankAtlantic before entering a BankAtlantic branch and personally changing the statements in November or December 2010. [Rolle Dep., at 52:24–53:8; 183:14–185:24]; [Stmt. of Material Facts, Exh. "D," at p. 3].

17. Plaintiff also continued to have personal access to his 7425 Account. [Rolle Dep., at 214:25–216:14] (authenticating signatures). For example, shortly after the 7425 Account was opened, on January 25, 2007, Plaintiff made a cash withdraw of $3,500.00 from the 7425 Account. [Aff. in Support, at ¶ 17]; [Rolle Dep., at 214:25–216:14]. Plaintiff also made cash withdrawals of $6,500.00 on April 4, 2008, $20,000.00 on April 7, 2008, $46,000.00 on April 11, 2008, $6,000.00 on May 23, 2008, and $180,000.00 on June 30, 2008 among others. [Aff. in Support, at ¶ 17]; [Rolle Dep., at 214:25–216:14].

18. By 2005, Plaintiff had begun playing football for the Baltimore Ravens. [Rolle Dep., 83:3–83:5]. Plaintiff continued to direct deposit checks from the Baltimore Ravens into his 7425 Account. [Rolle Dep., 90:5–90:14]. To Plaintiff's knowledge, the direct deposit from the Tennessee Titans to the Baltimore Ravens merely "rolled over." [Rolle Dep., 90:8–90:10].

19. While playing for the Ravens, Plaintiff maintained a local checking account with M&T Bank for personal expenses. [Rolle Dep., 80:4–81:5]. Plaintiff did not personally open this checking account, but rather, Rubin traveled to Baltimore and opened this checking account on Plaintiff's behalf. [Rolle Dep., at 82:11–82:20]. During the time in which the M&T Bank account was open, Pro Sports would fund the M&T bank account with transfers from Plaintiff's BankAtlantic checking account maintained by Pro Sports upon Plaintiff's request. [Rolle Dep., at 81:20–82:4].

20. In 2007 or 2008, Plaintiff attended a conference call hosted by Rubin in which Rubin and Ronnie Gilley ("Gilley") proposed to Plaintiff a private placement investment in a casino project known as Country Crossing. [Rolle Dep., at 133:8–133:25]. After attending the conference call, Rubin arranged for a private airplane to transport Plaintiff from a private airport in Pompano Beach, Florida, to Alabama for the purpose of viewing another similarly operating

5

casino known as Victoryland, and to otherwise review the proposed Country Crossing Investment. [Rolle Dep., at 133:23–134:8].[3]

21.     Plaintiff then agreed to invest more than $2 million dollars in an entity known as Miami Pro Group II, LLC. [Rolle Dep., at 136:24–137:13]; [Stmt. of Material Facts, Exh. "F," at p. 13]. The investment was intended "to secure land for a country-western themed multi-purpose entertainment project in Alabama." [Stmt. of Material Facts, Exh. "F," at p. 13]. Plaintiff initially authorized a $1 million dollar investment; however, he then increased the amount of his investment to $2 million dollars upon being offered a greater interest in residual concert income from live music entertainment shows that were to take place at Country Crossing. [Rolle Dep., at 138:18–139:1].

22.     Following this proposal and agreement, Plaintiff transferred funds by wire transfer to Ronnie Gilley Properties, LLC, (an entity related to the Alabama-based project) in the following amounts:

- $150,000.00 on March 7, 2008;[4]
- $250,000.00 on May 22, 2008;
- $1,700,000.00 on May 30, 2008;
- $135,000.00 on July 10, 2008;
- $250,000.00 on June 2, 2009; and
- $140,000.00 on July 21, 2009.

[Aff. in Support, at ¶ 18]. Plaintiff further testified that he knew that the investments that he was making with Ronnie Gilley Properties, LLC, for the Country Crossing project were being funded with transfers from his BankAtlantic account maintained by Pro Sports. [Rolle Dep., at 137:14–137:18].

23.     During the time in which these transfers were made, Rubin and Pro Sports maintained "near complete control of the [Plaintiff's] family finances." [Stmt. of Material Facts, Exh. "F," at p. 13].

---

[3] Plaintiff later visited the Country Crossing project again with Rod Mack, a Pro Sports employee and childhood friend of the Plaintiff. [Rolle Dep., at 142:15–143:5].

[4] On April 17, 2008, the recipient of the funds refunded this transfer to the Plaintiff's account in the full amount of $150,000.00. [Aff. in Support, at ¶ 18].

24. In addition to Country Crossing, Plaintiff also invested in a tax credit scheme through Pro Sports named Broward Energy Partners in 2006 or 2007. [Rolle Dep., at 144:24–145:6].

25. Specifically, with respect to both the Country Crossing and Broward Energy investments, the Plaintiff stated at his deposition as follows:

> **Q:  You wanted to make that transaction to invest in Country Crossing?**
> **A: Correct.**
> **Q: Where did the money come from to invest into Country Crossing?**
> **A: From my account.**
> **Q: Your BankAtlantic account?**
> **A: Yes, I would assume.**
>   . . .
> **Q: And you intended to make that investment; is that correct?**
> **A: Yes.**
> **Q: What monies were used to fund that investment?**
> **A: Money from Pro Sports and BankAtlantic.**
> **Q: So you intended the money to go from BankAtlantic to pay for the Broward Energy Investment?**
> **A: Yes.**
> **Q: And you asked Jeffrey Rubin at Pro Sports to make that transaction?**
> **A: Yes.**
> **Q: With Country Crossing, did you ask Jeff Rubin or anyone else at Pro Sports to make the transaction for you to pay for the Country Crossing and Ronnie Gilley investment?**
> **A: Jeff Rubin.**
> **Q: And that investment was made by him?**
> **A: Yes.**

26. Rubin and Plaintiff continued to discuss the investments via text message. [Stmt. of Material Facts, Exh. "G" and "H"]; [Rolle Dep., at 156:10–156:16].[5]

27. Following the July 21, 2009 wire transfer, Plaintiff began receiving dividends from the both Ronnie Gilley Properties, LLC, and the Miami Pro Group II, LLC. Such dividends were received in the following amounts:

- $100,000.00 on August 25, 2009;
- $20,000.00 on October 9, 2009;
- $10,000.00 on December 22, 2009;

---

[5] Exhibit "G," Exhibit "H," and the redacted pages of the Plaintiff's deposition transcript will be provided to the Court in accordance with Local Rule 5.4(b) and the confidentiality agreement between the parties.

- $50,000.00 on March 8, 2010;
- $50,000.00 on April 23, 2010;
- $50,000.00 on May 3, 2010;
- $10,000.00 on June 10, 2010;
- $15,000.00 on June 24, 2010;
- $20,000.00 on July 16, 2010; and
- $25,000.00 on August 6, 2010.

[Aff. in Support, at ¶ 19].

28. Plaintiff began to suspect that problems existed with Pro Sports' management of his finances around the time of his retirement in March of 2010 when he began receiving telephone calls from creditors informing him that his bills were delinquent. [Rolle Dep., at 105:25–106:21]. At some time between Plaintiff's retirement in March of 2010 and the end of 2010, Plaintiff terminated Pro Sports' as his financial manager by sending a series of cease and desist letters to Pro Sports with the assistance of counsel. [Rolle Dep., at 111:23–113:1].

29. During this same time period from March 2010 through the end of 2010, Plaintiff, along with financial advisors Eric Pettus and Amy Dawkins, entered the Pro Sports headquarters and retrieved five to six boxes of Plaintiff's financial information. [Rolle Dep., at 111:7–111:17; 113:6–113:23; 114:20–116:20]. The financial records obtained by Plaintiff, Pettus, and Dawkins included all of Plaintiff's BankAtlantic account statement dating back to 2001. [Rolle Dep., at 117:1–118:17]. Plaintiff, Pettus, and Dawkins then took the BankAtlantic account statements and other records to Plaintiff's home. [Rolle Dep., at 120:6–122:16]. Pettus an Dawkins spent three to four days with Plaintiff reviewing his financial information and statements. [Rolle Dep., at 118:18–118:23].

30. Also in November or December 2010, Plaintiff personally entered a BankAtlantic branch location and ordered a complete set of his account statements dating back to 2008. [Rolle Dep., at 166:12–166:21; 168:12–168:23; 170:20–171:17]. Plaintiff also changed the address for delivery on his account statements for his 7425 Account from Pro Sports' address to his personal address at 16201 Quiet Vista Circle, Delray Beach, FL 33446. [Rolle Dep., 165:10–166:5]. On December 15, 2010, Plaintiff began receiving account statements for the 7425 Account at his home in Delray Beach. [Aff. in Support, at ¶ 15]

8

31. Ten days after he ordered his statements from the BankAtlantic branch, Plaintiff returned to the BankAtlantic branch, retrieved the account statements, and took them back to his home where he personally reviewed them. [Rolle Dep., at 172:18–173:10].

32. Plaintiff also retained the law firm of Kozyak, Tropin & Throckmortin to pursue an action with the Financial Industry Regulatory Authority ("FINRA"). [Rolle Dep., 118:25–119:15; 172:18–174:19]. On March 25, 2011, Plaintiff filed a Statement of Claim and initiated arbitration proceedings against a variety of individuals and entities, including Pro Sports and Rubin. [Stmt. of Material Facts, Exh. "F"]. Prior to initiating this FINRA Arbitration, Plaintiff provided his attorneys with his complete BankAtlantic account statements.

33. In his FINRA Arbitration Statement of Claim, Plaintiff sought to recover against both Rubin individually and Pro Sports, as well as a number of other parties, based upon their improper investment advice related to Country Crossing and other investments. [Rolle Dep., at 100:21–101:6]; [Stmt. of Material Facts, Exh. "F," at p. 26]. Notably, Plaintiff admitted that "Pro Sports Financial Inc. handled everything from Mr. Rolle's electric bills to his wedding planning," and that in response to a solicitation from Rubin, "Mr. Rolle invested at least $2,000,000 in the Miami Pro Group II, LLC," an investment vehicle associated with Country Crossing [Stmt. of Material Facts, Exh. "F," at p. 13].

34. Plaintiff eventually entered into a confidential settlement agreement with defendants in the FINRA Arbitration claim, including Rubin and Pro Sports. [Rolle Dep., at 160:2–160:7]. Plaintiff also engaged in a pre-suit mediation with the law firm of Greenberg Traurig related to improper legal representation of Plaintiff in connection with his investments in Country Crossing. [Rolle Dep., 204:20–205:18].

35. Plaintiff filed a petition to modify his child support obligations in the Eleventh Judicial Circuit in and for Miami-Dade County on January 12, 2011. [Stmt. of Material Facts, Exh. "I"]; [Rolle Dep., at 146:5–146:14]. On June 22, 2013, that court entered a Supplemental Final Judgment for Modification with findings of fact regarding Plaintiff's change in financial circumstances. [Stmt. of Material Facts, Exh. "J"]. Consistent with the allegations in the FINRA Arbitration Statement of Claim, the court found that "[t]he Father's professional sports investment advisor handled all of the Father's income and expenses, even paying the Father's and his family's monthly bills." [Stmt. of Material Facts, Exh. "J," at ¶ 7].

36. In connection with Plaintiff's Petition, Plaintiff executed interrogatories on March 17, 2011. In answering those interrogatories, Plaintiff supplied information from his BankAtlantic accounts, including his 7425 Account, which came from his BankAtlantic Account statements, including the account's high balance as listed only on his April and May 2009 BankAtlantic account statements. [Rolle Dep., at 182:8–183:9]. In those interrogatories, Plaintiff stated under oath that:

> [a]ll mail of a financial nature (bank statements, mortgage statements, auto loan statements, credit card statements, investment statements, utility bills, auto insurance premium notices, homeowners insurance notices, etc.) were being sent directly to the financial planner's office. After a series of disturbing events transpired over the past year, petitioner ultimately fired his financial planner in December 2010.

[Stmt. of Material Facts, Exh. "D," at p. 3]; [Rolle Dep., at 183:14–185:24].

37. On March 21, 2013, Plaintiff filed the instant action against BankAtlantic in the Seventeenth Judicial Circuit Court in and for Broward County, Florida, which was served on BankAtlantic on March 28, 2013. [Doc. 1]. At no time prior to the initiation of this lawsuit, did Plaintiff ever object to any transactions concerning his BankAtlantic accounts or notify BankAtlantic of any allegedly unauthorized activity or accounts. [Doc. 1].

Respectfully submitted,

*/s/ David S. Hendrix, Esq.*
David S. Hendrix, Esq.
Florida Bar No. 827053
David.Hendrix@gray-robinson.com
Mark D. Schellhase, Esq.
Florida Bar No. 57103
Mark.Schellhase@gray-robinson.com
GRAY ROBINSON, P.A.
401 E. Jackson Street (33602)
Suite 2700
Post Office Box 3324
Tampa, Florida  33601-3324
(813) 273-5000
(813) 273-5145 (fax)

and

Alexandra de Alejo, Esq.
Florida Bar No. 43108
Alexandra.dealejo@gray-robinson.com

>GRAY ROBINSON, P.A.
>1221 Brickell Avenue
>Suite 1600
>Miami, Florida 33131
>Phone: 305-416-6880
>Fax: 305-416-6887
>*Attorneys for BB&T*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of March, 2014, a true and correct copy of the foregoing was sent by ECF filing to the following:

Kadisha D. Phelps, Esq.
Sweetapple, Broeker & Varkas, P.L.
777 Brickell Avenue, Suite 600
Miami, FL 33131
Kadisha@broekerlaw.com
Docservice@broekerlaw.com

>*/s/ David S. Hendrix, Esq.*
>Attorney